UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| SAMAR KAYYAL, <br><br> Plaintiff, <br><br> v. <br><br> ENHANCED RECOVERY COMPANY, LLC a/k/a ERC and ENHANCED RESOURCE CENTER, <br><br> Defendant. | Case No.: 1:17-cv-02718 <br><br> District Judge Hon. John J. Tharp, Jr. <br><br> Magistrate Judge Sidney I. Schenkier |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

**NOW COMES** Plaintiff, SAMAR KAYYAL ("Plaintiff"), by and through her undersigned counsel, responding to Enhanced Recovery Company, LLC a/k/a ERC and Enhanced Resource Center's ("Defendant" or "ERC") Statement of Material Facts as follows:

1. Plaintiff, SAMAR KAYYAL ("Plaintiff') is an individual who resides in the Northern District of Illinois. (Dkt. 1,¶ 4.).

**Response:** Undisputed.

2. Defendant ERC is a Delaware corporation with its principal place of business located in Jacksonville, Florida. (Dkt. 1, ¶ 6.).

**Response:** Undisputed.

3. This Court has federal question jurisdiction of this case, which has been brought pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227 and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. (Dkt. 1, ¶¶ 1-2.).

**Response:** Undisputed.

1

4. Venue is proper in this District because Plaintiff is an Illinois resident and claims to have received the subject calls in this jurisdiction and ERC conducts business in the this jurisdiction. (Dkt. 1, ¶¶ 4-5.).

**Response:** Undisputed.

5. ERC is a company that services debts on behalf of its clients. (Declaration of Richard "Rocky" Landoll ("Landoll Decl."), ¶ 3.).

**Response:** Undisputed.

6. On December 7, 2016, ERC was retained by its client, AT&T, to service a debt that a third party incurred with AT&T ("Debt") (Landoll Decl., ¶ 4.).

**Response:** Undisputed.

7. When the account was placed with ERC, ERC was provided with information pertaining to the Debt, including the name of the third party debtor, the third party debtor's contact information and the amount of the debt owed. (Landoll Decl., ¶ 5).

**Response:** Undisputed.

8. As part of its policies and procedures, ERC routinely conducts telephone number scrubs to find telephone numbers that are associated with the person ERC is attempting to reach. Conducting scrubs increases ERC's chances of right or intended party contact. (Landoll Decl., ¶ 6).

**Response:** Undisputed.

9. On December 7, 2016, ERC conducted a scrub of the third party debtor's telephone number through its vendor, TLO. (Landoll Decl., ¶ 7).

**Response:** Undisputed.

10. ERC has conducted scrubs through TLO for nearly four (4) years and TLO has provided reliable information. (Landoll Decl., ¶ 7).

**Response:** Undisputed that ERC has conducted scrubs through TLO for nearly four (4) years. Plaintiff disputes that the information TLO provides ERC is reliable because as set forth below, the information TLO provided to ERC regarding a third party debtor that ERC was attempting to collect a debt from resulted in erroneous collection calls being placed to the Plaintiff in this case.

11. The scrub results revealed that there was a high probability that telephone number ending in 4667 was associated with the intended third party debtor. (Landoll Decl., ¶ 8).

**Response:** Plaintiff disputes this Statement on the basis that "high probability" is not defined. Moreover, as set forth below, the subject scrub in this case provided erroneous information that resulted in ERC attempting to collect a debt from the wrong person, thus calling into question its reliability.

12. From December 8, 2017 through March 7, 2017, ERC placed a total of 40 calls to a phone number ending in 4667 in an attempt to reach the intended third party debtor. (Landoll Decl., ¶¶ 9 and 21; Exhibit 1 to Landoll Decl.).

**Response:** Disputed. ERC placed at least 42 calls to Plaintiff's number ending in 4667 from December 8, 2017 through March 7, 2017 from the phone numbers (800) 875-5164 and (312) 470-6642. *See* Exhibit A attached hereto, a true and correct copy of Verizon Wireless's call records for Plaintiff's number ending in 4667[1]; Exhibits 1 to Landoll Decl. and Stark Decl.; *see also* attached Exhibit B, ERC's Responses to Plaintiff's Interrogatories, Response to Interrogatory No. 4. Specifically, there are two (2) calls reflected on the Verizon Wireless records (Exhibit A hereto) on January 4, 2017 and January 13, 2017 that are not reflected on ERC's records. *Compare* Exhibit A hereto to Exhibits 1 to Landoll Decl. and Stark Decl. ERC's records indicate only one call was placed to Plaintiff on January 4, 2017 and January 13, 2017, while the Verizon Wireless records

---

[1] Verizon Wireless is Plaintiff's wireless service provider for the number ending in 4667. Verizon Wireless produced Plaintiff's call records for the 4667 number in response to a subpoena issued by Plaintiff.

reflect two calls placed by ERC on January 4, 2017 and January 13, 2017. *Id.* Moreover, there are two (2) calls reflected on ERC's records that are not reflected on the Verizon Wireless records, one on January 3, 2017 and the other on January 12, 2017. Furthermore, ERC's records indicate that two calls were placed on January 12, 2017 while the Verizon Wireless records only reflect one call on January 12, 2017. *Id.* Accordingly, a comprehensive reading of the parties' records reveals that ERC placed at least 42 calls to Plaintiff's number ending 4667. *Id.*

13. On March 7, 2017, ERC's collector contacted telephone number 4667 to attempt to reach the intended third party debtor. (Landoll Decl., ¶¶ 10 and 21; Exhibit 1 to Landoll Decl.).

**Response:** Undisputed.

14. A female answered the March 7, 2017 call. During the call, the ERC collector, who identified herself as Christine Wilcox, asked to speak with the third party debtor. In response, the female asked ERC to "take me off the phone list." (Landoll Decl., ¶¶ 11, 21 and 23; Exhibits 1 and 2 to Landoll Decl.).

**Response:** Undisputed.

15. Immediately after the call on March 7, 2018, ERC updated its records, removed telephone number ending in 4667 from its system, and ceased contacting telephone number ending in 4667. (Landoll Decl., ¶¶ 12 and 21; Exhibit 1 to Landoll Decl.; Stark Decl., ¶ 23; Exhibit 1 to Stark Decl.).

**Response:** Undisputed.

16. ERC did not place any outgoing call to telephone number ending in 4667 after March 7, 2017. (Landoll Decl., ¶ 13).

**Response:** Undisputed.

4

17. ERC has never sent a collection letter, or any other correspondence to Plaintiff. (Landoll Decl., ¶ 14).

**Response:** Undisputed.

18. ERC had no reason to send Plaintiff a collection letter or call her because Plaintiff was not a consumer that ERC attempted to collect a debt from. (Landoll Decl., ¶ 14).

**Response:** Undisputed.

19. The phone calls that plaintiff alleges violated the TCPA were received by her between December 2016 and March 2017. (Dkt. 1, ¶ 15.).

**Response:** Undisputed.

20. Plaintiff alleges she received calls from ERC to her cellular phone with telephone number ending in 4667. (Dkt. 1, ¶ 7.).

**Response:** Undisputed.

21. ERC never left a voice message when it called telephone number ending in 4667. (Landoll Decl., ¶¶ 19 and 21; Exhibit 1 to Landoll Decl.).

**Response:** Undisputed. ERC was not able to leave voicemails because Plaintiff did not set up the voicemail function on her cellular phone. *See* Exhibit C attached hereto, Plaintiff's Deposition Transcript; 35:19-36:6.

22. ERC's account notes show that with the exception of four days, ERC made no more than one call in a single day to telephone number ending in 4667. On the four days ERC made more than one call, ERC made no more than two calls in a single day. (Landoll Decl., ¶¶ 21 and 22; Exhibit 1 to Landoll Decl.; Stark Decl., ¶ 23; Exhibit 1 to Stark Decl.).

**Response:** Disputed. Defendant made more than one call to Plaintiff's cellular telephone on **five** separate days: December 16, 2016, January 4, 2017, January 13, 2017, February 10, 2017, and

5

February 13, 2017. *See* Exhibit A, phone calls from ERC's phone numbers (800) 875-5164 and/or (312) 470-6642 on December 16, 2016, January 4, 2017, January 13, 2017, February 10, 2017, and February 13, 2017. ERC's phone records only show one call from ERC to Plaintiff's cellular phone on January 4, 2017 and January 13, 2017, when in fact there were two calls from ERC to Plaintiff's cellular phone on January 4, 2017 and January 13, 2017. *Compare* Plaintiff's Exhibit A to Exhibits 1 to Stark. Decl. and Landoll Decl.

23. With the exception of one call on December 16, 2017, at 11:43 a.m., ERC made all calls to telephone number ending in 4667 using the LiveVox Human Call Initiator ("HCI") System outbound dialing system. (Landoll Decl., ¶ 17; Declaration of Kevin Stark ("Stark Decl."), ¶¶ 3 and 23; Exhibit 1 to Stark Decl.).

**Response:** Undisputed.

24. ERC is a customer of LiveVox. (Stark Decl., ¶ 3.).

**Response:** Undisputed.

25. ERC accesses the software through a secure online portal. (Stark Decl., ¶ 3.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

26. ERC does not install any LiveVox system onto its own computers. (Stark Decl., ¶ 3.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

27. LiveVox's human-initiated dialing systems require each call to be manually initiated by an agent: an employee or other person working on behalf of the LiveVox customer making the call. (Stark Decl., ¶ 4.).

6

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

28. Each of LiveVox's human-initiated dialing systems is designed and built by LiveVox so as not to be capable of automated or predictive dialing. (Stark Decl., ¶ 4.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

29. HCI is one of LiveVox's human-initiated outbound dialing systems. (Stark Decl., ¶ 6.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

30. HCI is a distinct outbound dialing system, separated from LiveVox's other outbound dialing systems at the hardware and software level. (Stark Decl., ¶ 6.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

31. HCI uses a unique combination of software and hardware that is not shared with any other LiveVox system. (Stark Decl., ¶ 6.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

32. The software underlying HCI is designed only to enable the type of calls launched in HCI. (Stark Decl., ¶ 6.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

33. All HCI calls are routed through a set of servers exclusively dedicated to HCI calls. Those HCI servers cannot launch automated calls. (Stark Decl., ¶ 7.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

34. Every call launched using HCI requires human intervention by an agent: an employee or other person working on behalf of the LiveVox customer making the call. The human intervention takes the form, in part, of a "clicker agent" clicking on a dialogue box to confirm the launching of a call to each particular telephone number. The call will not be launched unless the clicker agent clicks on the dialogue box. (Stark Decl., ¶ 8.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

35. The clicker agent is also able to monitor a real-time dashboard that contains information about "closer agent" availability, number of calls in progress, and related metrics. (Stark Decl., ¶ 9.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

36. The closer agent is the agent designated by the LiveVox customer to speak with the call recipient. (Stark Decl., ¶ 9.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

37. In order for a call to be launched in HCI, the clicker agent must take the action previously described and there must also be a closer agent who is available to take the call. (Stark Decl., ¶ 9.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

38. HCI is designed to allow a clicker agent to control how often calls are made by reviewing the dashboard and making judgments based on that information when deciding when to launch any particular call. (Stark Decl., ¶ 9.).

**Response**: Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

39. A clicker agent, when logged into HCI, is logged into HCI only and not into any other LiveVox outbound dialing system. (Stark Decl., ¶ 10.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

40. To log into any other LiveVox outbound dialing system, the clicker agent would first need to log out of HCI. (Stark Decl., ¶ 10.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

41. HCI does not use any predictive or other kind of algorithm to engage in predictive dialing of any kind. For example, HCI does not use a statistical algorithm to minimize the time that agents spend waiting between calls, nor does it use an algorithm to minimize the occurrence of a consumer answering a call when no closer agent is available. (Stark Decl., ¶ 11.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

42. HCI does not have the present capacity to auto-dial; it does not have any features that permit autodialing and there are no features in HCI that can be turned on to enable autodialing. (Stark Decl., ¶ 12.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

43. HCI does not have the potential capacity to auto-dial; there are no features that can be activated, deactivated, or added to the system to enable auto-dialing. There is no external application programming interface ("API") with which to add software to the system; the components of HCI are designed so as not to be able to transfer a list from one component to another; and the server that launches HCI calls only recognizes a request from the HCI agent presentation layer, which itself requires a click for each call. (Stark Decl., ¶ 13.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

44. HCI does not have the capacity to produce numbers to be called using a random or sequential number generator. (Stark Decl., ¶ 14.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

45. HCI does not have the capacity to generate random ten digit phone numbers and then to dial them. This means that HCI does not have the capability of assembling arbitrary ten- digit telephone numbers to be called. (Stark Decl., ¶ 15.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

46. HCI does not have the capacity to generate sequential ten digit phone numbers and then to dial them. In other words, HCI does not assemble ten digit phone numbers such as (111) 111-1111, (111) 111-1112, and so on. (Stark Decl., ¶ 16.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

47. HCI does not use an artificial or pre-recorded voice. (Stark Decl., ¶ 17.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

48. On December 16, 2017, at 11:43 a.m., ERC placed a call to telephone number ending in 4667 using the LiveVox Manual ("Manual") System outbound dialing system. (Landoll Decl., ¶ 18; Stark Decl., ¶¶ 3 and 23; Exhibit 1 to Stark Decl.).

**Response:** Undisputed.

49. Manual is a distinct outbound dialing system, separated from LiveVox's other outbound dialing systems at the hardware and software level. (Stark Decl., ¶ 18.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

50. Manual uses a unique combination of software and hardware that is not shared with any other LiveVox system. (Stark Decl., ¶ 18.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

51. The software underlying Manual is designed to enable only the type of calls launched in Manual. (Stark Decl., ¶ 18.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

52. All Manual calls are routed through a set of servers exclusively dedicated to Manual calls. Those Manual servers cannot launch automated calls. (Stark Decl., ¶ 18.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

53. Every call launched using Manual requires human intervention by an agent. (Stark Decl., ¶ 19.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

54. Manual does not use any predictive or other kind of algorithm to engage in predictive dialing of any kind. (Stark Decl., ¶ 21.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

55. Manual does not have the present capacity to auto-dial, nor does it have any features that permit auto-dialing, nor are there any features which can be turned on to enable auto-dialing. (Stark Decl., ¶ 21.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

56. Manual does not have the potential capacity to auto-dial; there are no features in Manual that can be activated, deactivated, or added to enable auto-dialing. There is no external application programming interface ("API") with which to add software to the system. (Stark Decl., ¶ 22.).

**Response:** Undisputed that this Statement accurately reflects the testimony provided in the declaration of Mr. Stark.

57. Manual does not have the capacity to store or produce numbers to be called using

**Response:** Disputed as unintelligible.

12

**Local Rule 56.1(b)(3) Statement of Additional Facts**

1. Between December 8, 2016 through March 7, 2017, ERC placed at least forty-two (42) calls to Plaintiff's cellular telephone number ending in 4667. *See* Plaintiff's Response to ERC Statement of Fact No. 12; Exhibit A; Exhibit C; 13:11-13.

2. The purpose of ERC's phone calls to Plaintiff was to collect a debt from an individual that is not known to Plaintiff. *See* Exhibit B; ERC Response to Interrogatory No. 18; Exhibit C, 13:3-5; ERC Statement of Fact Nos. 13, 18.

3. Plaintiff has no relationship with ERC and does not know how ERC obtained her number ending in 4667. *See* Exhibit C, 51:24-52:1.

4. Plaintiff has had the phone number ending in 4667 since at least 2015. *See* Exhibit C; 13:9-14:5.

5. At the time ERC placed calls to Plaintiff, Plaintiff did not owe any debt to anyone and was not receiving calls from any debt collectors but ERC. *See* Exhibit C, 9:2-23; 25:7-26:20; 18:13-19:1.

6. Shortly after ERC's calls began, around Christmas time (December 2016), Plaintiff picked up a call from ERC and advised ERC that they were calling the wrong person. *See* Exhibit C, 32:15-21.

7. Despite being notified that it was calling the wrong party around Christmas time (December 2016), ERC continued placing calls to Plaintiff's cellular phone, attempting to collect a debt owed by a third party. *See* Exhibit A; Exhibit C, 30:16-32:21; Exhibit B, ERC Responses to Interrogatory Nos. 8, 18.

8. From December 2016 through March 7, 2017, Plaintiff told ERC that it was calling the wrong party on many occasions (over 20) and asked ERC to stop calling her. *See* Exhibit A; Exhibit C, 20:2-22:24; 29:13-22; 30:16-32:21; 52:10-12.

9. On many occasions, ERC would hang up after Plaintiff advised ERC that it was calling the wrong person, only to call back at a later time. *See* Exhibit A, 20:2-21:18; 30:17-32:14.

10. From December 2016 through March 7, 2017, ERC placed at least 42 calls to Plaintiff's cellular phone, with the vast majority of calls taking place after Plaintiff advised ERC that it was calling the wrong party. *See* Plaintiff's Response to ERC Statement of Fact No. 12; Exhibit A; Exhibit C, 20:2-22:12; 29:13-32:21.

11. During that time period, ERC placed more than one call per day to Plaintiff's cellular phone on five separate days, including December 16, 2016, January 4, 2017, January 13, 2017, February 10, 2017, and February 13, 2017. *See* Exhibit A, phone calls from ERC's phone numbers (800) 875-5164 and/or (312) 470-6642 on December 16, 2016, January 4, 2017, January 13, 2017, February 10, 2017, and February 13, 2017; Exhibit B, ERC Response to Interrogatory No. 4.

12. Plaintiff is employed as a divisional supervisor for Hartz Construction Company. *See* Exhibit C, 15:4-16:14. Plaintiff has been employed by Hartz Construction Company for 20 years. *Id.*

13. ERC would place calls to Plaintiff's cellular phone during work hours and even on the weekends. *See* Exhibit A generally, and specifically ERC phone call on February 18, 2017 (Saturday).

14. ERC's phone calls significantly frustrated Plaintiff's ability to perform her tasks at work. *See* Exhibit C, 8:18-9:12; 20:16-19; 33:15-34:4; 39:6-40:14.

14

15. Plaintiff lost customers due to the stress and distraction caused by ERC's collection calls. *See* Exhibit A, 39:6-40:14.

16. ERC's continuous phone calls were harassing and caused Plaintiff anxiety, stress, and adversely impacted her sleep. *See* Exhibit A, 9:14-24; 20:2-21:19; 33:15-34:4; 38:2-9; 39:6-40:14; 42:1-18.

17. The stress and anxiety from ERC's phone calls caused Plaintiff to physically shake. *See* Exhibit A, 38:2-9.

18. Moreover, Plaintiff's family members and other third parties overheard ERC's collection calls to Plaintiff, which resulted in significant embarrassment to Plaintiff as Plaintiff's family members and other third parties were led to believe that Plaintiff is delinquent on her financial obligations. *See* Exhibit A, 8:18-9:12; 40:17-41:1.

19. ERC's records and the Verizon Wireless records do not individually reflect all calls placed by ERC to Plaintiff's cellular phone ending in 4667. *See* Plaintiff's Response to Statement of Fact No. 12; *Compare* Plaintiff's Exhibit A to Exhibits 1 to Landoll Decl. and Stark Decl.

20. During one call with ERC, Plaintiff advised ERC that it was calling the wrong party and that ERC continued to call Plaintiff after she requested the calls cease. *See* Exhibit D attached hereto, ERC Phone Recording (ERC Bates Label 02371). In response, ERC stated that it would be hard for ERC to take Plaintiff off the "do not call list" because Plaintiff did not have an account with ERC. *Id.*

21. ERC did not produce the phone recording referenced in the preceding paragraph until Plaintiff's counsel specifically demanded it during ERC's deposition, after discovering that ERC did not produce the highly probative recording. *See* Exhibit E, an email exchange between Plaintiff's counsel and ERC's counsel regarding the recording. The recording was responsive to

15

previous discovery requests issued to ERC on June 16, 2017, and was not produced until June 6, 2018, nearly 1 year after it was requested. *See* Exhibit E, and Exhibit F attached hereto, Plaintiff's Requests for Production to ERC, Requests Nos. 2, 3, 6.

Dated: November 28, 2018　　　　　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　　　　　/s/ Mohammed O. Badwan
　　　　　　　　　　　　　　　　　　　　　　　　Mohammed O. Badwan, Esq.
　　　　　　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff*
　　　　　　　　　　　　　　　　　　　　　　　　Sulaiman Law Group, Ltd.
　　　　　　　　　　　　　　　　　　　　　　　　2500 S. Highland Avenue, Suite 200
　　　　　　　　　　　　　　　　　　　　　　　　Lombard, Illinois 60148
　　　　　　　　　　　　　　　　　　　　　　　　Phone: (630) 575-8180
　　　　　　　　　　　　　　　　　　　　　　　　mbadwan@sulaimanlaw.com

## **CERTIFICATE OF SERVICE**

    I, Mohammed O. Badwan, an attorney, certify that on November 28, 2018, I caused the foregoing **RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS** to be served upon counsel of record through operation of the Court's Case Management/Electronic Case File (CM/ECF) system.

/s/ Mohammed Badwan